IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDREW G.                          :         CIVIL ACTION
                                   :
        v.                         :
                                   :
COMMISSION OF SOCIAL               :         No. 23-cv-3504
SECURITY                           :

**<u>MEMORANDUM OPINION</u>**

**CRAIG M. STRAW**                                  **January 29, 2025**
**United States Magistrate Judge**

      Plaintiff, Andrew G., seeks review of the Commissioner's decision denying his

application for Disability Insurance Benefits (DIB).  The parties consented to proceed before a

Magistrate Judge[1] and the matter was assigned to me.  For the following reasons, I deny

Plaintiff's request for review and affirm the Commissioner's decision.

## I.    <u>PROCEDURAL HISTORY</u>

      In October 2020,[2] Plaintiff filed an application for DIB under the Social Security Act

(SSA), alleging a disability onset date of October 11, 2019 (AOD).  R. 10, 82-83, 181.  The

claim was denied initially on February 4, 2021, and then again on reconsideration.  R. 105, 114-

24.  Plaintiff filed a written request for a hearing.  R. 125.  On May 13, 2022, a telephone hearing

occurred before Administrative Law Judge (ALJ) Lisa Parrish because of the Covid-19

Pandemic.  R. 10, 44, 46.  Plaintiff testified at the hearing and appeared with his counsel, Melissa

---

[1] See Doc. 6; 28 U.S.C. § 636(c)(1) & Fed. R. Civ. P. 73(a).
[2] Several dates are used in the record as the filing date of the application.  R. 10, 82-83, 181.  The
application itself is dated October 27, 2019.  R. 181.

Green, Esquire.  R. 46.  Vocational Expert (VE) Sherry Kristal-Turetzky also testified at the hearing.  R. 46, 73-81.

The ALJ denied benefits.  R. 30-31.  Plaintiff sought review of the ALJ's decision, which was denied.  R. 1.  Thus, the ALJ's decision became the final decision of the Commissioner of Social Security.  R. 2-3; 20 C.F.R. § 404.981.  Plaintiff's counsel then filed this action in federal court.  Doc. 1.  Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  Doc. 9.  Defendant filed a Response to Request for Review of Plaintiff.  Doc. 12.  Plaintiff filed a Reply Brief.  Doc. 13.

## II.    <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Commissioner employs a five-step sequential process to determine if a claimant is disabled, evaluating:

1.    Whether the claimant is currently engaged in substantial gainful activity;

2.    If not, whether the claimant has a "severe impairment" that significantly limits their physical or mental ability to perform basic work activities;

3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments (Listings), <u>see</u> 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity (RFC) to perform their past work; and

5.     If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform based on the claimant's age, education, and work experience.

See Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014); 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to establish that the claimant can perform other jobs in the local and national economies based on their age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citations omitted).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" and must be "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Zirnsak, 777 F.3d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 102-03 (2019) (explaining substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (additional citations omitted)). It is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing Schaudeck, 181 F.3d at 431).

## III.    ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

The ALJ determined that Plaintiff acquired sufficient quarters of coverage to remain insured through December 31, 2024. R. 11, 13. The ALJ found Plaintiff had not engaged in any substantial gainful activity since the AOD. R. 13. Plaintiff had severe impairments including

3

rotator cuff tear, heart failure, chronic kidney disease, degenerative joint disease of the knees, neuropathy, and anxiety disorder.  R. 13; 20 C.F.R. § 404.1520(c).[3]  The ALJ decided that Plaintiff's impairments, either singly or in combination, did not meet or medically equal any of the Listings.[4]  R. 14; 20 C.F.R. pt. 404, subpt. P, app. 1; see also 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Considering the entire record, the ALJ found that Plaintiff had the RFC to perform light work with several additional limitations.  R. 19-20.  Plaintiff could not climb ladders, ropes, scaffolds, or crawl.  R. 20.  He could occasionally perform other postural activities.  Id. at 20. Plaintiff would be able to occasionally operate foot pedals with the left lower extremity and could only occasionally push, pull, and reach overhead with the left, nondominant upper extremity.  Id.  Plaintiff could also only occasionally work around concentrated fumes, smoke, dust, or mold or in extreme temperatures and could never work at unprotected heights or near unguarded industrial machinery.  Id.  Moreover, Plaintiff was limited to simple and repetitive tasks and simple work-related decisions.  Id.  Finally, Plaintiff was limited to occasional work in a customer service capacity.  Id.

---

[3] The ALJ found Plaintiff's other impairments such as hypertension, hyperlipidemia, and diverticulitis of the colon, were non-severe.  R. 13.  The ALJ mentioned that Plaintiff was borderline obese, but it was a non-severe impairment because nothing indicated that Plaintiff's "near obesity" affected his other conditions.  Id.  The ALJ also noted the record contained passing references to transient ischemic attacks and seizures, but Plaintiff had not received treatment, nor did he testify about any work-related limitations from the attacks and seizures, so the ALJ found they were not medically determinable impairments.  Id. at 14.
[4] The ALJ discussed in detail several Listings related to his impairments and the Paragraph B and C criteria.  R. 14-19.  I do not address these in any detail because Plaintiff's claims only relate to his physical impairments.  Doc. 9, at 2-11.

The ALJ determined that Plaintiff could not perform any past relevant work.  R. 28; 20 C.F.R. § 404.1565.  The ALJ then decided considering Plaintiff's age, education, work experience and RFC, he could perform other jobs that exist in significant numbers in the national economy including collator operator, a marker, and a routing clerk.  R. 29-30; 20 C.F.R. § 404.1569, 404.1569a.  Therefore, Plaintiff was not disabled.  R. 11, 31.

In his request for review, Plaintiff asserts that the ALJ did not reasonably find that he could stand and walk most of the day because of Plaintiff's limitations from his neuropathy, osteoarthritis of his knee, and heart failure.  Doc. 9, at 2-12.  He also claims that the ALJ erred when assessing Plaintiff's subjective complaints.  Id. at 4-9.  The Commissioner argues that substantial evidence supports the RFC of light work with some limitations and the ALJ properly evaluated Plaintiff's subjective complaints.  Doc. 12, at 6-18.

## IV.    FACTUAL BACKGROUND

Plaintiff was born in 1968 and was an individual closely approaching "advanced age" on the AOD.  R. 29, 82-83, 181; 20 C.F.R. § 404.1563(d).  Plaintiff has at least a high school education and one year of college.  R. 29, 99.  In the past, Plaintiff worked in several truck driver positions and as an operating engineer, at both medium and heavy exertional levels, with work actually performed on at least a medium exertional level.  R. 28.  Plaintiff now seeks disability benefits because of various medical issues beginning with his second cardiac event in 2019.  R. 56; Doc. 9, at 6.

A.  **Medical evidence**[5]

1.  **Cardiac Issues/Heart Failure**

Plaintiff had his first heart attack in 2016 or 2017 that he just "blew off" and went back to work because he did not think anything was wrong.  R. 56, 742.  At that time, he underwent post left anterior descending (LAD) artery stenting at Crozier Chester Medical Center.  R. 742.

On October 12, 2019, Plaintiff reported to the medical aid unit with chest discomfort, nausea, and dry heaving and was admitted to Christiana Hospital.  Id.  A cardiac catheterization was performed, and Plaintiff was noted to have multivessel coronary artery disease with a patent stent to the LAD artery.  R. 21-22, 742.  A balloon angioplasty, thrombectomy, and stenting of the right coronary artery (RCA) with a drug-eluting stent was conducted.  R. 742.  Plaintiff was admitted to the ICU unit and eventually the stepdown unit.  Id.  An echocardiogram on October 13, 2019, revealed severely reduced LV (left ventricle) systolic function with an ejection fraction (EF)[6] of 25-30%, grade 1 diastolic dysfunction, mild LVH, and mild aortic root dilation with a maximus diameter of 3.9 cm.  Id.  He was placed on goal directed therapy for his LV dysfunction and was fitted for a LifeVest.  Id.  Plaintiff was discharged from the hospital on October 16, 2019.  Id.

---

[5] I focus on the pertinent facts related to Plaintiff's physical impairments and some evidence pre-dating the disability period for background purposes.

[6] Ejection fraction is the measurement, expressed as a percentage, of how much blood the left ventricle pumps out with each contraction.  See https://www.heart.org/en/health-topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-measurement (last visited January 17, 2025).  A normal heart's EF is between 55 and 70 percent.  Id.  An EF from 41% to 49% "does not always indicate that a person is developing heart failure, but it could indicate damages, perhaps from a previous heart attack."  Id.

On October 22, 2019, Plaintiff presented at Cardiology Health Center Christiana ("CHCC") for a follow up visit.  R. 741-42.  Overall, he reported feeling well after discharge with some episodes of lightheadedness and dizziness, especially when he bent over.  R. 742.  Plaintiff also reported getting fatigued easily and some nausea and indigestion.  Id.  Plaintiff continued to wear the LifeVest with no reported shocks or alarms.  Id.

At a November 6, 2019 CHCC visit, Plaintiff said he had no chest pressure pain.  R. 731.  Plaintiff had been hospitalized a few days prior for what appeared to be a case of viral gastroenteritis.  Id.  The doctor changed his medication Brilinta for Effient in case the symptoms were related to the medication.  R. 732.  The doctor wanted to "reecho" Plaintiff in the future.  Id.

Notes from January 24, 2020 showed Plaintiff was doing well in cardiac rehabilitation and was not having chest pain.  R. 755-56.  A recent echocardiogram, however, did not indicate significant improvement in LV function with an EF of 25-30%.  R. 756.  Plaintiff continued to wear the recommended LifeVest.  Id.  The notes provided that Plaintiff had been doing "reasonably well in rehabilitation and with activities of daily living."  Id. at 757.

Approximately a month later at a February 10, 2020 appointment, Plaintiff complained of mild weight gain and generalized fatigue.  R. 736.  He denied any chest pain, palpitations, shortness of breath, diaphoresis, paroxysmal nocturnal dyspnea (PND), or orthopnea.  Id.  Plaintiff's EF was at 30% and he still wore the LifeVest.  Id.  A repeat echocardiogram was scheduled for two weeks to determine if Plaintiff needed an implantable cardioverter-defibrillator (ICD).  Id.  Office notes from February 26, 2020 show that Plaintiff's EF at that time was up to 45%, and the LifeVest was removed, but he had torn his left rotator cuff sawing off a

7

tree limb doing yard work.  R. 705.  During a July 2020 telehealth visit, Plaintiff said he was doing well from a cardio perspective with no chest pain, pressure, no PND, orthopnea, palpitations, syncope, or progressive exertional dyspnea.  R. 700.  An echocardiogram done in June 2020 indicated an EF of 45%.  Id.  The notes stated that based on a conversation with Plaintiff the doctor believed Plaintiff was "compensated from a cardiac perspective and on that basis made no adjustments to his medication."  Id.  He encouraged Plaintiff to continue with his exercise regimen and dietary restrictions and follow up with a visit in three months.  R. 700-01.

In May 2021, Plaintiff's EF remained at 45% with no symptoms except for some fatigue with prolonged activity.  R. 1508-09.  The notes stated that his left arm was in a sling, and he had "glove stocking sensory neuropathy."  R. 1509.  He remained in "sinus rhythm," was normotensive, and could complete everyday activities without cardiovascular issues or concerns. Id.  He was directed to see the doctor again in six months.  Id.

When Plaintiff moved to Pennsylvania, he began to see Cardiology Consultants of Philadelphia, P.C. in February 2022.  R. 1554.  His EF was similar to previously reported values at 40-45%.  R. 1555, 1559.  The most recent cardiac catheterization showed coronary stable anatomy with patient stents in chronically occluded PDA branch with 99% long tubular stenosis and 80% proximal obtuse marginal branch 2 and 70% 1st diagonal.  R. 1559.  Plaintiff denied weakness, fatigue, dizziness, and shortness of breath.  R. 1560.  The doctor reported Plaintiff was compensated from a cardiovascular perspective, his blood pressure was well-controlled with his current medication, and he had no symptoms of unstable angina, decompensated heart failure, or symptomatic dysrhythmia.  R. 1562.

### 2. Right Knee Osteoarthritis

An x-ray from September 16, 2021 taken before Plaintiff's appointment with First State Orthopaedics P.A. (FSA) indicated tricompartment osteoarthritis and narrowing of the medial joint space along with loose body in the suprapatellar bursa.  R. 1365.  The x-ray also showed a well-defined 6 mm lesion of the proximal tibial diaphysis, benign lesion favored.  Id.  Plaintiff visited FSA on September 21, 2021 with complaints of right knee pain; he had not previously seen anyone for this pain.  R. 1349.  Plaintiff reported wearing a knee sleeve for years and thought he had more pain because his right leg was supporting his left side.  Id.  An examination revealed moderate to large effusion on the right knee, varus alignment, limping, with swelling.  R. 1351.  When Plaintiff attempted to squat, he fell down.  Id.  The diagnosis was early advanced varus pattern OA (osteoarthritis).  R. 1353.  Treatment included a Kenalog injection in the right knee that day.  R. 1352-54.  The doctor recommended physical therapy (PT) or a home exercise program to Plaintiff along with other modalities such as rest, saving steps for important activities, low impact aerobic exercise, considering use of a cane, and NSAIDs.  R. 1354.

On October 19, 2021, Plaintiff attended a follow-up visit with FSA.  R. 1355.  The Plaintiff reported that the steroid injection helped, and relief had lasted a few weeks.  Id.  Plaintiff continued to wear an over-the-counter knee brace and was working with a trainer at the YMCA.  Id.  Another right knee steroid injection was administered.  R. 1359.  On November 16, 2021, Plaintiff returned complaining about knee swelling and pain when weight bearing.  R. 1360.  He received a right knee aspiration for the swelling.  R. 1363-64.  Plaintiff's treatment plan for knee OA was reviewed and Plaintiff was advised to rest, decrease impact loading sports,

stretch more, do less strength training when the knee was inflamed, and perform low impact exercise. R. 1364.

Plaintiff switched to Chesapeake Sports and Orthopedic (CSO) beginning in December 2021. R. 1511. At a December 14, 2021 appointment, Plaintiff continued to have medial knee pain with swelling but wanted to hold off on steroid injection at that time. Id. Plaintiff was given another knee aspiration and tolerated the procedure well. R. 1513-14. On January 11, 2022, Plaintiff reported rehabbing on his own and continued to wear a roadrunner brace. R. 1515. He said he just dealt with and pushed through the pain. Id. Plaintiff was waiting for a shipment of Euflexxa. Id. At his February 8, 2022 appointment, Plaintiff had another repeat knee aspiration. R. 1519, 1521-22. Because of knee pain, he had not visited the gym in the last two weeks. R. 1519. He also received a Kenalog injection. R. 1523. On March 8, 2022, Plaintiff said the prior injection helped but was wearing off. R. 1524. He received his first Euflexxa injection in a series, which Plaintiff tolerated well. R. 1524, 1526-27. Plaintiff received his second Euflexxa injection on March 15, 2022. R. 1530-31. He reported improvement and received a third Euflexxa injection on March 22, 2022. R. 1532, 1535.

### 3. Left Leg Neuropathy

There are several references in the record to Plaintiff's "left leg femoral neuropathy," "femoral neuropathy," "glove stocking neuropathy," or just "neuropathy" in general.[7] Most of the references to neuropathy are included in the medical history of the treatment notes for

---

[7] See R. 569, 696, 705, 719, 732, 888, 945, 1018, 1056, 1193, 1199, 1214, 1349, 1509, 1511, 1515, 1519, 1524, 1528, 1532, 1583, 1626-27, 1629, 1725, 1735, 1843, 1891, 1893, 1912, 1931-32, 1958-59, 1962, 1964-65, 1978.

appointments regarding other medical issues, specifically Plaintiff's ongoing cardiac problems, OA, or kidney issues (not at issue here).

Plaintiff explained at the hearing that he had the left femoral neuropathy from a motor vehicle incident in 2010. R. 59, 1912. Plaintiff's PCP has treated his neuropathy and Plaintiff has taken Cymbalta and claims he saw a pain management specialist. R. 60, 1280, 1629, 1912. The record contains directives from other medical providers for Plaintiff to schedule an appointment with neurology, but as of May 2022, Plaintiff had not attended any neurology appointments. R. 1628, 1893, 1961, 1964. The record shows another incident occurred in 2021 when Plaintiff tripped and fell because of peripheral neuropathy due to a closed head injury in 2011. R. 1781, 2005. The ALJ listed neuropathy as a severe impairment and referred to Plaintiff's left leg neuropathy throughout her decision. R. 13, 17, 21-22, 28.

### 4. Other medical evidence

Jeff Daly, PT, DPT, provided a medical source statement (MSS) from an evaluation of Plaintiff on September 11, 2020. R. 373-383, 1538-1548. As relevant here, Mr. Daly found that Plaintiff could stoop/forward bend occasionally, and could sit, stand, and walk occasionally.[8] R. 374. He opined that Plaintiff could tolerate sedentary work for less than two hours a day. R. 374, 379. Plaintiff reported his general pain level at a zero. R. 375-76. Plaintiff was independent with self-care and light chores. R. 375.

The Bureau of Disability Determination referred Plaintiff to Patrick Frisella, D.O., for an internal medicine examination which occurred on December 1, 2021. R. 1370-74. Plaintiff reported that he lived with his girlfriend and did not need help at home. R. 1371. He had a

---

[8] Occasional was defined as 6-33% of an 8-hour day. R. 374.

driver's license and drove places.  Id.  Plaintiff cooked, did laundry, and took care of his children, as needed, when they were with him.  Id.  He cleaned every other day and went shopping twice a week.  Id.  Plaintiff showered and dressed himself daily.  Id.  Plaintiff also watched television, listened to the radio, read, used social media, and socialized with friends.  Id.

During the physical examination, Plaintiff's blood pressure (BP) was high, but he denied any symptoms directly related to his BP.  R. 1372.  Plaintiff's gait was normal, but he had difficulty walking on heels and toes with inconsistent effort.  Id.  He did a full squat; his stance was normal, and he did not bring any assistive device to the exam.  Id.  Plaintiff did not require any help getting on and off the exam table and was able to rise from a chair without difficultly.  Id.  X-rays of his right knee showed degenerative changes.  R. 1373.  The strength in his upper and lower extremities was 5/5 and no muscle atrophy was present.  Id.

On a physical MSS, Dr. Frisella determined that Plaintiff sit and stand up to eight hours at a time and walk one hour at a time without interruption.  R. 1376.  Dr. Frisella noted Plaintiff did not require a cane to ambulate.  Id.  Dr. Frisella found he could continuously operate foot controls.  R. 1377.  Plaintiff could frequently climb stairs and ramps, occasionally climb ladders or scaffolds and crawl, and continuously balance, stoop, kneel and crouch.  R. 1378.  Plaintiff could occasionally be exposed to unprotected heights, humidity, and wetness, and extreme cold or extreme heat, and continuously tolerate moving mechanical parts, operate a motor vehicle, be exposed to dust, odors, perfumes, and pulmonary irritants, and vibrations.  R. 1379.

In February 2021, Vinod Kataria, M.D., found at the DIB initial level that based on the medical records, Plaintiff could perform light work with certain postural, manipulative, and environmental limitations.  R. 87.  Additionally, in January 2022, Angela Teresa Walker, M.D.,

found at the reconsideration level that Plaintiff's RFC was light, with some postural limitations including only occasional climbing ramps/stairs and ladders/ropes/scaffolds and environmental limitations, namely avoiding concentrated exposure to vibrations and hazards.  R. 97-100.[9]

### B. Plaintiff's testimony

Plaintiff testified at the hearing about his living situation, abilities, and past work.  R. 50-73.  He had been living with his girlfriend until Easter of 2022.  R. 51.  They would help each other and share the house chores.  Id.  Plaintiff would drive seven days a week if he had to pick up medications or four to five times a week otherwise.  R. 51-52.  Plaintiff would also drive to the store or to pick up his children, who were with him every other weekend.  R. 51.  Plaintiff claims he used the assistance of a cart or a walking stick when he was out at the store.  Id.

Plaintiff's past work included commercial truck driving during which he had to safely deliver materials to his customers and maintain the truck.  R. 52.  He regularly lifted up to fifty pounds.  R. 52-54.

When the ALJ asked Plaintiff to explain why he felt like he could no longer do any work, Plaintiff responded that he gets "winded easily" because of the condition of his body and that he still experiences chests pain from his anxiety, which was "very high" at the time of the hearing. R. 55.  Plaintiff also stated his "femoral neuropathy from an accident from a long time ago

---

[9] Two third-party non-medical statements were also part of the record.  R. 27.  Domenic Petrocelli wrote a statement discussing Plaintiff's femoral neuropathy and cardiac issues (as well as shoulder and kidney issues).  R. 27, 328-29.  The other, from Plaintiff's sister, Michele Spaeder, addressed Plaintiff's cardiac and kidney issues and noted his limited ability to stand.  R. 27, 333-34.  The ALJ found these statements were not from disinterested medical sources and she did not deem them inherently valuable or persuasive evidence.  See 20 C.F.R. § 404.1520c. Thus, the ALJ only considered them to the extent they were consistent with the evidence from the medical sources in the case.  R. 27.

makes it very hard for [him] to stay stable with [his] two legs and balance." Id.  He takes a combination of pills for his cardiac issues.  R. 57.  The chest pain comes on when Plaintiff is sitting or when he slowly reclines himself and "it takes [his] breath away" and "feels like it's a broken rib." Id.  Plaintiff reported the pain lasts about twenty seconds and then he gets his breathing back.  R. 58.  Plaintiff cannot walk long distances, and when he walks, he frequently stops, and takes his time. Id.

Plaintiff discussed a 2010 head-on motor vehicle accident resulting in his leg neuropathy. R. 59.  When the ALJ asked Plaintiff how he could perform all the heavy-duty trucking work after the accident despite his claim he was now disabled, he replied that the pain now is overwhelming and it "puts more stress on my body and my heart . . . and it just makes [his] day so much harder because, from the neuropathy." Id.  Plaintiff asserted he no longer has any muscle in his left leg and the big toe and the second toe on his left foot are starting to "turn and curl under."  R. 60.  Plaintiff treated the neuropathy with his primary doctor and pain management specialist and was "getting by." Id.

Plaintiff received Cortisone shots and drained his right knee on several occasions.  R. 67. He said it has deteriorated and is now arthritic with "bone on bone" rubbing. Id.  He can receive more injections but must wait ninety days after the first one for insurances purposes. Id. Regarding how his knee affects his ability to stand up, sit down, and walk, Plaintiff said he must "set himself" to stand up and walk, and then must stretch his knee approximately every thirty minutes.  R. 68.

## V.    DISCUSSION

### A.    Substantial evidence supports the ALJ's RFC determination that Plaintiff could perform light work with additional restrictions.

An RFC assessment is the most a claimant can do in a work setting despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a)(1).  The RFC is based on all the relevant and other evidence in the case record.  Id. § 404.1545(a)(3).  It is the ALJ's exclusive responsibility to determine the claimant's RFC.  20 C.F.R. § 404.1546(c).  An ALJ must include in the RFC any credibly established limitations the record supports.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007).

The ALJ's RFC assessment must be "'accompanied by a clear and satisfactory explication of the basis on which it rests.'"  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).  Nevertheless, the ALJ is not required to discuss or refer to every piece of the relevant evidence in the record when assessing an RFC.  Id. at 42.  Once an ALJ has made an RFC determination it will not be set aside provided substantial evidence supports the RFC.  Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).

In this case, the ALJ found that Plaintiff was capable of light work, with some additional limitations including that he could not climb ladders, ropes, or scaffolds or crawl.  R. 19-20.  He could occasionally perform other postural activities, only occasionally operate foot pedals with the left lower extremity, and could only occasionally push, pull, and reach overhead with the left, nondominant upper extremity and frequently perform other manipulative activities with that extremity.  Id. at 20.  Plaintiff could also occasionally work around concentrated fumes, smoke, dust, or mold and in extreme temperatures and never work at unprotected heights or near

unguarded industrial machinery.  Id.  Moreover, Plaintiff was limited to simple and repetitive

tasks, simple work-related decisions, and only occasional work in the customer service capacity.

Id.

Regarding Plaintiff's RFC, the ALJ explained that:

> After a thorough review of the evidence of record, including the claimant's allegations and testimony, forms completed at the request of the Social Security Administration, the objective medical findings, medical opinions, and other relevant evidence—including evidence not cited in this decision—I find that the claimant is capable of performing work consistent with the [RFC] established in this decision.  As mentioned above, treatment notes and examination records do not sustain the claimant's allegations of disabling symptoms and limitations.  The claimant experiences some symptoms and limitations; however, the record is not entirely consistent and does not fully support the severity of the claimant's allegations.  The claimant's various impairments appear to be generally controlled with conservative, routine, treatment such as medication management, injections and physical therapy.  He did undergo a rotator cuff repair procedure, but his shoulder seems to have responded well to this surgery and the aftercare.  The claimant's combination of impairments would limit him to light work with the additional limitations listed above.  He is limited to occasional foot controls on the left due to his neuropathy. . . Looking at the evidence in the light most favorable to the claimant and factoring in the combined impact of his physical impairments, he is limited to simple, repetitive tasks, simple work-related decisions and occasional work in a customer service capacity.  No additional limitations are supported based on the treatment record, which also reflected mild to moderate findings and some improvements in the claimant's condition.  In conclusion, the [RFC] listed above is supported by the medical evidence of record as a whole and is the most accurate assessment of the claimant's work-related capabilities since the [AOD].

R. 27-28.[10]

---

[10] The ALJ also noted that she asked the VE about a sit/stand option:

Plaintiff asserts that as a "matter of common sense" a finding that a person with OA, neuropathy of the lower extremities, and heart failure with an EF of 42% can stand/walk six hours a day and five days a week is "unreasonable and illogical." Doc. 9, at 9. He claims that the ALJ failed to provide an accurate and logical bridge between the evidence and Plaintiff's RFC. Id.

Plaintiff's argument fails. The ALJ found and cited substantial evidence in the record in support of Plaintiff's light work[11] RFC with additional limitations because of his specific physical impairments. R. 27-28. First, regarding Plaintiff's OA, the ALJ determined, and the record supports the OA of his right knee has generally been controlled and managed through injections, medications, rest, stretching, use of a knee sleeve, and PT. R. 25, 1349, 1354-55,

---

I find that the medical evidence, as discussed above, does not support a finding that the claimant requires such a limitation. However, when I asked the [VE] whether jobs exist in the national economy for an individual with the claimant's age, education, work experience and [RFC] with the additional restriction that he be allowed to alternate between sitting and standing approximately every hour throughout the workday, the [VE] testified that the claimant would still be able to perform both the collator operative position (with reduced national numbers of 30,200 positions) and the routing job clerk (with reduced numbers of 25,400 jobs), as well as the position of private sector mail clerk (DOT #209.687-026 with reduced number of 4,6000 jobs), which is also light, unskilled work with a SPV level of 2. I find the numbers given to be significant. R. 30.

[11] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities . . . ." 20 C.F.R. § 404.1567(b). A full range of light work "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Title II & XVI: Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251, at *6 (1983).

1358-59, 1364, 1515, 1523-24, 1526-27, 1530-32, 1535.  Notably, his knee pain improved with recent Euflexxa injections.  R. 1524, 1532, 1535.  Evidence in the record also demonstrates Plaintiff can perform light work including sitting and standing required for that RFC based on his consistent activities such as independently caring for himself, preparing meals, driving on a regular basis to the store and to pick up his kids, performing household chores, exercising at the gym, and doing yardwork.  R. 51-52, 216-18, 225-27, 401, 537, 1118, 1371; see 20 C.F.R. § 404.1545(a)(3).  He reported needing "no help" at home.  R. 1371.  Plaintiff presented in no acute stress with normal gait[12] and stance during a December 2021 examination, he could get on and off the table on his own, and he brought no assistive device to the exam.  R. 1372.  Dr. Frisella noted "difficulty walking on heels and toes" but "with inconsistent effort."  Id.  Despite his orthopedist's suggestion that he may wish to try it to help his knee, Plaintiff walks without the use of a cane.[13]  R. 1354, 1372, 1376.  This evidence all supports a finding that Plaintiff is capable of a light work RFC and standing or walking "off and on" for six hours of an eight-hour workday.  See SSR 83-10, 1983 WL 31251, at *6.

Moreover, Plaintiff has failed to demonstrate that his left leg neuropathy prevents him from standing and walking as required by a light work RFC.  Doc. 9, at 7.  Plaintiff testified that he had left femoral neuropathy from a motor vehicle incident in 2010 and had been treating it with his PCP and taking Cymbalta.  R. 59, 1280, 1629, 1912.  He also sees a pain management specialist.  R. 60.  Plaintiff was directed to see a neurologist for additional treatment, but at the

---

[12] On one instance in the record during a routine exam Plaintiff's gait was described as "abnormal."  R. 1895.

[13] Plaintiff testified that when he went to the grocery store when he was living with his girlfriend, he would use an assistive power cart or walking stick.  R. 51.

time of the hearing he had not done so.  R. 1628, 1893, 1961-62, 1964.  No additional evidence in the record addresses possible restrictions because of his left leg neuropathy.

When the ALJ asked how Plaintiff could perform all the heavy-duty trucking work after the accident with the left leg neuropathy, Plaintiff responded that the pain is "overwhelming" and makes his day "so much harder," but he "gets by" treating the neuropathy with his PCP.  R. 60. Plaintiff's conservative treatment of his left leg neuropathy coupled with his failure to see a neurologist about the condition, his ability to perform heavy-duty work after the accident (despite his purported limitations and pain), and the absence of any evidence in the record supporting additional restrictions because of this impairment, are sufficient to support the light work RFC.  See, e.g., Morales v Comm'r of Soc. Sec., 799 F. App'x 672, 676-77 (11th Cir. 2020) (stating conservative treatment plan tends to negate claim of disability and undermines claimant's testimony about intensity and limiting effects of symptoms); see also Roger D. v. Kijakazi, No. 20-cv-1806, 2021 WL 4191434, at *10 (D.N.J. Sept. 15, 2021) (noting medication management and injections constitute conservative treatment) (citing cases).  Even so, the ALJ accounted for Plaintiff's left leg neuropathy in his RFC by restricting Plaintiff to only occasional foot controls on the left.  R. 28.

Substantial evidence also supports Plaintiff's light duty RFC even considering Plaintiff's history of heart failure.[14]  Although Plaintiff underwent a cardiac catheterization in October 2019

_____

[14] Plaintiff also asserts that he should be found disabled based on Grid Rule 201.14.  Doc. 9, at 11; Doc. 13, at 3.  Since I find the ALJ's decision to limit Plaintiff's RFC to light work is supported by substantial evidence, Grid Rule 201.14 does not apply because it pertains to sedentary work.  See Poole v. Colvin, No. 12-cv-922, 2013 WL 4735174, at *3 n.4 (W.D. Pa. Sept. 3, 2013) (noting rule "provides that when maximum sustained work capacity is limited to sedentary work and the individual is 50–54 years of age with education of a high school graduate

which showed he had coronary artery disease and decreased LV function, including a lowered EF of 25-30% and was fitted for a LifeVest, his heart condition has significantly and steadily improved since that time.  R. 21-22, 742.  As of January 2020, he was doing well in rehabilitation and daily activities of living.  R. 757.  He no longer had to wear the LifeVest by the end of February 2020 and his EF was up to 45%.  R. 705.  From a cardiac standpoint he continued to do well and improve in July 2020, May 2021, and February 2022.  R. 700, 1508-09, 1559-62.  As of May 2021, he had no symptoms except for some fatigue with prolonged activity and completed everyday activities without cardiovascular issues or concerns.  R. 1509. Plaintiff's heart issues do not negate the finding that Plaintiff is capable of a light work RFC with some additional restrictions.  Plaintiff's overall argument fails, and the ALJ's RFC is supported by substantial evidence.[15]

### B.  Substantial evidence also supports the ALJ's findings regarding Plaintiff's subjective symptoms.

The ALJ also properly considered Plaintiff's subjective symptoms and found that they were inconsistent with the medical record as a whole.  R. 25.  To evaluate a claimant's symptoms, first it is determined whether a claimant has "a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms."  Social Security Ruling 16-3P: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-

---

or more . . . with previous skilled or semi-skilled skills not transferrable, then the individual is disabled."); 20 C.F.R. Part 404, subpt. P, app. 2, § 201.14.

[15] As previously noted, even when factoring in a sit/stand option Plaintiff would not have been disabled because he could still perform work as a collator operator and routing clerk job.  See supra, fn. 10.

3P, 2016 WL 1119029, at *3 (S.S.A. Mar. 16, 2016). The ALJ then evaluates the intensity and persistence of an individual's symptoms such as pain and determines the extent to which the symptoms limit the claimant's ability to perform work-related activities. Id. at *4-*5. In addition to the objective medical evidence in the record, at the second step the ALJ considers factors relevant to the claimant's symptoms including: (1) daily activities; (2) location, duration, and frequency of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of medication; (5) treatment, other than medication, received; (6) other measures taken to relieve pain; and (7) other factors. See 20 C.F.R. § 404.1529(c)(3)(i)-(vii). An ALJ may discount subjective complaints if they are inconsistent with the objective medical evidence. See 20 C.F.R. § 404.1529(c)(4); see also Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159, 164 (3d Cir. 2008) (stating "[i]nconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of claimant's testimony about her limitations or symptoms is less than fully credible") (citation omitted).

After finding Plaintiff had impairments, the ALJ determined that the limiting effects of the symptoms he alleged were inconsistent with the medical evidence as a whole. R. 25. The record substantiates that finding. As support, the ALJ opined that Plaintiff's impairments had been controlled through relatively conservative, routine treatment[16] like injections, PT, and

---

[16] Plaintiff claims the ALJ's rejection of his testimony as inconsistent was improper because while she classifies his impairments as having "been controlled through relatively conservative, treatment," he still has "joint pain, numbness and paresthesia." Doc. 9, at 10. As Defendant points out, the decision includes qualifying language that the medical records "generally" reflect they have been controlled. R. 25; Doc. 12, at 9-10. Additionally, evidence that Plaintiff has some limitations does not prove he is incapable of the light work duty RFC the ALJ assigned for the other reasons set forth in this decision. See McIntyre v. Berryhill, No. 17-cv-2176, 2018 WL 5962476, at *5 (D.N.J. Nov. 13, 2018) (citation omitted) (stating in order to be fit for work,

medication.  R. 59-60, 700-01, 1354, 1359, 1529, 1530-32, 1535, 1554-55, 1629.  Moreover, his heart condition had stabilized since it occurred in 2019 and his knee had improved with treatment.  R. 700-01, 1508-09, 1532, 1555, 1559-60.  She also found that Plaintiff's daily activities of driving, household chores, and yardwork were inconsistent with his asserted limiting effects of his impairments.  R. 25, 51-52, 215-22, 401, 537, 1118, 1371.  The ALJ relied on permissible grounds in the record to reject Plaintiff's alleged disabling limitations.  See e.g., 20 C.F.R. § 404.1529(c)(3)(i)-(vii), § 404.1529(c)(4); see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence.").  We defer to that conclusion.  See Biestek, 587 U.S. at 108.

 For these reasons, the ALJ did not err when she evaluated Plaintiff's subjective symptoms.

---

claimant need not be pain-free or symptom free); Bennick v. Berryhill, No. 16-cv-2391, 2017 WL 2957870, at *12 (M.D. Pa. July 11, 2017) (citations omitted) (noting many Third Circuit decisions have found claimant need not be pain free to be found "not disabled" especially when claimant's work issue requires lower exertional level); see also R. 25.

## VI.    <u>**CONCLUSION**</u>

Substantial evidence supports Plaintiff's RFC for light work with additional restrictions because of his limitations.  Additionally, the ALJ did not err when she assessed Plaintiff's subjective symptoms.

For these reasons, Plaintiff's request for review (Doc. 1) is **DENIED**.  An appropriate order accompanies this opinion.


BY THE COURT:

<u>/s/ Craig M. Straw</u>
CRAIG M. STRAW
U.S. Magistrate Judge